# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00642-CV

**Coalition for Long Point Preservation and Mr. and Mrs. William Sutton, Appellants**

**v.**

**Texas Commission on Environmental Quality and Long Point Partners, L.L.P., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
## NO. GN100942, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## O P I N I O N

Appellants, the Coalition for Long Point Preservation and Mr. and Mrs. William Sutton (collectively Athe Coalition@), appeal from a district-court judgment affirming a final order of the Texas Commission on Environmental Quality granting a permit to build and operate a municipal solid-waste landfill to Long Point Partners, L.L.P. (Long Point). The Coalition asserts in six issues that substantial evidence does not support the Commission=s findings and conclusions that Long Point made all of the required regulatory demonstrations relating to fault studies, subsidence, groundwater monitoring, floodplain analysis, excavation, and drainage. Because we find substantial evidence to support the Commission=s order, we affirm the district court=s judgment affirming that order.

## BACKGROUND

Long Point filed an application for a municipal solid-waste permit with the Commission to enable it to build and operate a landfill in Fort Bend County. Public notice was given when the application was administratively complete to inform potentially affected parties of their right to request a contested-case hearing. Several parties, including the Coalition, opposed the proposed permit and requested a contested-case hearing. The Commission granted a hearing and referred the matter to the State Office of Administrative Hearings. After several days of testimony, the two presiding administrative law judges (ALJs) issued a proposal for decision in favor of granting the permit, which the Commission accepted with minor alterations not relevant here. The Commission then entered its final order approving Long Point=s application and issued the permit. The Coalition filed a suit for judicial review in Travis County district court. *See* Tex. Gov=t Code Ann. ' 2001.171 (West 2000); Tex. Water Code Ann. ' 5.351 (West 2000). The district court affirmed the Commission=s order, and the Coalition now appeals.

## DISCUSSION

Judicial review of an administrative order following a contested-case proceeding is governed by the substantial evidence rule. *See* Tex. Gov=t Code Ann. ' 2001.174 (West 2000). The Coalition asserts that the Commission=s decision to issue Long Point the permit is not supported by substantial evidence in the record. *See id.* ' 2001.174(2)(E). In conducting a substantial-evidence review, we determine whether the evidence as a whole is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. *Stratton v. Austin Indep. Sch. Dist.*, 8 S.W.3d 26, 30 (Tex. App.CAustin 1999, no pet.). We may not substitute our judgment for that of the agency and may

2

only consider the record on which the agency based its decision. *Id.* The issue for the reviewing court is not whether the agency reached the correct conclusion, but rather whether there is some reasonable basis in the record for its action. *City of El Paso v. Public Util. Comm=n*, 883 S.W.2d 179, 185 (Tex. 1994). The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence, and the burden to prove otherwise is on the contestant. *Stratton*, 8 S.W.3d at 30.

The Coalition asserts six issues on appeal, each pertaining to a different regulatory requirement that an applicant must meet in order to be granted a permit to build and operate a landfill. We will address each issue separately.

### *Groundwater monitoring*

Title 30, section 330.231, of the administrative code requires applicants to submit a groundwater-monitoring plan that Aconsists of a sufficient number of monitoring wells, installed at appropriate locations and depths, to yield representative groundwater samples from the uppermost aquifer@ that will Aensure the detection of groundwater contamination in the uppermost aquifer.@ 30 Tex. Admin. Code ' 330.231(a), (a)(2) (2002). The Coalition argues that because the monitoring plan calls for wells that are positioned to detect contaminants at a maximum depth of approximately 50 feet below surface, when the aquifer extends to a depth of 150 feet, the plan is Agrossly inadequate.@ The Coalition is concerned that the plan allows 100 feet of the uppermost aquifer to go unmonitored and therefore cannot Aensure@ that contamination in the aquifer would be detected.

Long Point=s expert geologist, Richard Smith, testified that vertical migration of contaminants through the aquifer would be unlikely because of its heterogeneity (it is composed of interbedded clays and sands). He testified that the most Atransmissive@ zone of the aquifer is located in its top portion. The record also contains evidence of a professional flowpath analysis indicating that contaminants reaching the aquifer will move laterally to the northeast, east, and southeast, but that there is a Ageneral lack of vertical gradients [*i.e.*, pathways]@ in the aquifer. This evidence supports the ALJs= conclusions that contaminant flow through the aquifer will be lateral and that monitoring wells extending short of the entire depth of the aquifer are therefore adequate to detect contamination. In their proposal for decision, the ALJs noted that there is nothing in the record to indicate that contaminants moving through the aquifer will not be detected by the planned wells. They note, logically, that contaminants present at the bottom of the aquifer would have to pass through its upper parts to reach the greater depths. Although the wells are to be located at intervals of approximately 600 feet, and theoretically one could imagine that contaminants seeping into the earth between two wells could go unmonitored if they moved directly downward, the evidence is sufficient to support the ALJs= conclusion that any contaminants would instead move laterally and thus be detected by one or more wells.

Although the Coalition argues that the depth of the monitoring wells is inadequate, the only evidence supporting this position is testimony by the Coalition=s expert, Allen Messenger, who opined that Long Point had not demonstrated an adequate understanding of the hydrogeologic conditions at the site to show that the proposed monitoring wells would ensure detection of groundwater contamination. However, the ALJs were unpersuaded by Mr. Messenger=s testimony on this point because much of the information

concerning the uppermost aquifer is contained in geophysical logs, which Mr. Messenger admitted were beyond the scope of his expertise. The ALJs were free to weigh the evidence as they deemed appropriate. *See Montgomery Indep. Sch. Dist. v. Davis*, 34 S.W.3d 559, 567 (Tex. 2000); *Texas Water Comm=n v. Boyt Realty Co.*, 10 S.W.3d 334, 343 (Tex. App.CAustin 1993, no writ).

We hold that there is substantial evidence in the record to support the findings and conclusions that Long Point=s groundwater-monitoring plan is sufficient.[1] We overrule the Coalition=s third issue.

### Holocene fault

Title 30, section 3330.303(a) of the administrative code provides that landfills Ashall not be located within 200 feet of a fault that has had displacement in Holocene time unless the owner or operator demonstrates to the executive director that an alternative setback distance of less than 200 feet will prevent damage . . .@ 30 Tex. Admin. Code ' 330.303(a) (2002). Displacement is defined as the Adistance between two formerly adjacent points situated on opposite walls of a fault.@ *Id.* ' 330.2(37). A fault is Aa fracture or a zone of fractures in any material along which strata, rocks, or soils on one side have been displaced with respect to those on the other side.@ *Id.* ' 330.2(49). Thus, to comply with the regulations, without providing an additional demonstration to the Commission, an applicant=s site must not be located

---

[1] The Coalition also asserts that the ALJs improperly shifted the burden from Long Point to the Coalition by requiring it to show that the system would not be adequate, as opposed to requiring Long Point to prove that it would be. However, the Coalition did not preserve this issue for review because it failed to raise it in its motion for rehearing. *See Central Power & Light Co. v. Public Util. Comm=n*, 36 S.W.3d 547, 569 (Tex. App.CAustin 2000, pet. denied).

within 200 feet of a *particular* kind of faultCone that has had Adisplacement in Holocene time@ (approximately the last 10,000 years).

The ALJs found that Athe proposed landfill unit will not be located within 200 feet of a fault that has had displacement in Holocene time.@ Long Point has therefore sufficiently met the requirement of the regulation if there is substantial evidence to support the ALJs= finding. The Coalition cites evidence in the form of a contour map showing geologic units on the west side of the map at a higher elevation than those on the east side to assert that the landfill site *is* situated within 200 feet of a fault that has had displacement in Holocene time. It asserts that this difference in elevation is a displacement and that Long Point never disputed the fact that *if* a fault were present within the site, it would be a Holocene fault. However, the evidence in the record is almost entirely to the contrary, and certainly constitutes substantial evidence to support the finding that the landfill will not be located within 200 feet of a fault that has had displacement in Holocene time.

Regarding the contour map, the Coalition argues that the differences in elevation of units between the east and west sides of the site constitute a fault because *any* displacement *must* reveal a fault, as direct evidence of a fracture is virtually impossible. In other words, a fracture is an event, which itself is very hard to observe if one is not at the right place at the right time, and one must therefore look to the after-effects of the fracture to identify it. In our analysis, using logic and the definition of a fault, we can say that a fracture is a cause, and displacement is its effect. A fracture, or break, will cause displacement. However, the reverse does not necessarily hold true: a displacement is not necessarily caused by a fracture; it may have different causes. Indeed, a Commission staff geologist, T. Wesley McCoy, testified that the

**6**

elevational differences between the east and west sides were due to the fact that the sediments had been deposited not on flat surfaces, but on curved ones (so-called Alenticular bodies@). Dr. Carl Norman, Long Point=s geologist, similarly testified that the differences were not due to structural changes caused by a fault or an earthquake, but to variations in how the layers of earth were deposited (Astratigraphic changes@). Dr. Norman testified that to prove the existence of a fault in the area, the elevational difference (Avertical offset@) between displaced soils of individual layers of earth must increase with depth. Because the site data revealed greater offset at a depth of 200 feet than at depths below, the differences in elevation could not have been caused by a fault.

The Coalition next argues that evidence in addition to the contour map proves a Holocene fault. To the contrary, three sources of evidence in the recordCtestimony of the Coalition=s own geologist, Dr. Howard C. Clark, testimony of Long Point=s geologist, Dr. Norman, and the reference source *Geologic Atlas of Texas*Call indicate that the site is composed of sediments deposited during the Pleistocene Epoch, the geologic period *preceding* the Holocene Epoch. Dr. Norman further testified that because the surface sediments are of the Pleistocene age and have thus been present throughout the entire Holocene age, any fault at the site that has had displacement in Holocene time would be noticeable at the surface in one form or another (aAsurface expression@). Although there is some evidence in the record of a surface expression in the form of a steep slope (or Ascarp@) caused by a fault, other evidence rebuts it. One expert testified that the scarp was caused by pipelines running beneath the area, while another expert testified that he had extensively walked the entire site area and had found no scarps at all. At the hearing, the Coalition also argued that there is additional surface evidence of a fault in the form of a surface

depression (or Asag pond@) identified by its expert, Dr. Charles Kreitler. However, when questioned about the sag pond, Dr. Kreitler stated that there had previously been a levee in essentially the same location whose purpose was to keep water out of the subsiding area where active mining had been occurring. The ALJs were the sole judges of the weight to be assigned to conflicting evidence of the alleged fault. We conclude that the record contains substantial evidence that a fault with displacement in Holocene time does not exist within 200 feet of the proposed landfill and overrule the Coalition=s first issue.

*Subsidence*

Landfill operators applying for a permit must provide a description of the geologic processes active in the vicinity of the facility. *Id.* ' 330.56(d)(3)(A) (2002). The description must include Aan identification of any faults and subsidence in the area of the facility. The information about faulting and subsidence shall include at least that required in ' 330.303(b) and ' 330.305 of this title.@ *Id.* Section 330.303(b), relating to fault areas, requires:

> Applications submitted for the operation of sites located in areas that may be subject to differential subsidence or active geological faulting shall include detailed fault studies. . . . Areas experiencing withdrawal of crude oil, natural gas, [or] sulfur . . . shall be investigated in detail for the possibility of differential subsidence or faulting that could adversely affect the integrity of landfill liners.

*Id.* ' 330.303(b) (2002). Section 330.305 defines an unstable area to be Aa location that is susceptible to natural or human-induced events or forces capable of impairing the integrity of some or all of a landfill=s structural components responsible for preventing releases from the landfill@ and requires owners of landfills

located in such areas to demonstrate that engineering measures have been incorporated into the landfill=s design to ensure that the integrity of its structural components will not be impaired. *Id.* ' 330.305 (2002).

Long Point determined whether subsidence was occurring at the site by driving four markers, or Amonuments,@ into the ground at varying locations at the southern boundary of the site. The monuments were placed near the edge of where previous subsidence had occurred just south of the site boundary due to earlier sulfur-mining activity. Long Point measured the elevation of these monuments nine times over a two-year period. The ALJs determined that this subsidence study adequately revealed that subsidence had ceased in the vicinity of the site. In addition to this monument study, Long Point also conducted a survey of the foundations of existing structures built on the site in the 1940s, which revealed that no differential subsidence had occurred at the location since that time.

The Coalition argues that Long Point failed to comply with section 330.56 (d)(3)(A) by not identifying whether Aany@ subsidence is occurring. Specifically, the Coalition challenges finding of fact 116: AData collected over a two year period from subsidence monuments between Davis Estate Road and the proposed landfill unit show that no subsidence occurred at the monuments over that period of time.@ The Coalition asserts that this finding is not supported by substantial evidence because Long Point=s placement of the monuments prevented detection of Asite-wide@ subsidence, as all of the monuments could have been subsiding uniformly, and thus the study could not have ruled out Aany@ subsidence. Additionally, the Coalition asserts that site-wide subsidence could eventually cause the landfill to subside into the 100-year floodplain, and Long Point=s failure to identify site-wide subsidence is therefore fatal to the Commission=s issuance of the permit. We disagree.

9

First, the Coalition=s reading of the regulation is in error—it applies a broad meaning to one word, "any," that the regulation itself does not impart.  The regulation modifies the requirement to identify "any faults and subsidence" by stating that such information must include "*at least* that required in § 330.303(b) and § 330.305." *See id.* § 330.56(d)(3)(A) (emphasis added).  Section 330.303(b), in turn, reflects a concern about *differential* subsidence—particularly as it may affect landfill liners—rather than so-called site-wide or uniform subsidence: "areas that may be subject to differential subsidence . . . shall include detailed fault studies." *See id.* § 330.303(b).  If the entire site subsides equally, then *by definition* there is no differential subsidence, and no "subsidence" in the context of the applicable regulation.  Similarly, section 330.305 reflects a concern about unstable areas because of their potential to impair the integrity of a landfill=s structural components (such as a liner designed to prevent leakage of waste). *See id.* § 330.305.  An area is not unstable if its geologic processes will not disrupt the landfill=s structural integrity. *See id.*  Read in conjunction with section 330.303(b), section 330.305 does not address the possible effect of site-wide subsidence, but only differential subsidence or other events that could directly impair a landfill=s liner or other structural component.

There is expert testimony in the record indicating that even *if* future subsidence of any kind were to occur at the site, the landfill liner=s integrity would not be compromised.  This, combined with Long Point=s monument study and foundation survey, amounts to substantial evidence that the requirements of the regulations were met and to support finding of fact 116.  We overrule the Coalition=s second issue.

**10**

*Floodplain analysis*

Title 30, section 330.56(f)(4)(B)(i), of the administrative code requires an applicant to determine whether the landfill site is located within a 100-year floodplain and to use a Federal Emergency Management Agency (FEMA) map, if available, for such determination. *Id.* ' 330.56(f)(4)(B)(i) (2002). Long Point=s expert engineer, Jeffrey P. Young, used a 1997 FEMA flood insurance-rate map that delineated the 100-year floodplain, as well as a 1987 Fort Bend County study. His analysis indicated that the northeast edge of the permit area sits in the floodplain, but no part of the landfill footprint[2] does.

The Coalition argues that Long Point=s floodplain analysis is inaccurate because it relied on the county study instead of conducting its own baseline analysis. Thus, it argues, several key items of its application and the Commission=s order that depend on an accurate floodplain analysis are not supported by substantial evidence. As noted above, Mr. Young used in his analysis not only the county study of which the Coalition complains, but also a 1997 FEMA map. It appears that Long Point did exactly as required by the regulation in using the 1997 FEMA map. At the hearing, the Coalition relied on evidence that included a 1992 FEMA map. The delineations of the 100-year floodplain on the 1992 and 1997 FEMA maps are identical; the only difference between them is that the 1992 map has flood elevations marked on it while the 1997 map does not. However, the Coalition argues that Mr. Young used the elevations from the 1987 county study, which are not accurate, instead of those of the 1992 FEMA study.

---

[2] The landfill Afootprint@ is the portion of the land upon which the waste will actually be stored.

Although there is evidence in the record that some of the elevations on the 1987 county study—those along a creek-bed upstream from the site at a highway bridge—may have been erroneous, Long Point=s expert, Mr. Young, did not use those upstream elevations because his analysis did not extend to the bridge, which is well outside the boundaries of the site. Furthermore, as the ALJs noted, there is no basis in the record to conclude that the 1992 FEMA map elevations are more accurate than those of the 1987 county study. One of the Coalition=s experts, Dr. Philip Bedient, expressed concerns about the county study=s accuracy, but the ALJs did not assign any significant weight to his testimony throughout the proceeding, based on his willingness to offer his opinion on matters about which he admitted he knew little or nothing, and his repeated inconsistencies and recantations.

Additionally, Long Point=s floodplain analysis and site design allowed for over three feet of Afreeboard@ (buffer) at the exterior perimeter road and about eight feet near the landfill footprint, which the ALJs determined to be a conservative design. We conclude that the record contains substantial evidence to support the conclusion that Long Point=s floodplain analysis provided an accurate delineation of the 100-year floodplain and overrule the Coalition=s fifth issue.

### *Excavation outside the landfill footprint*

The Coalition argues that the permit granted by the Commission allows excavation of topsoils outside the landfill footprint to be used as cover for waste. It claims that the regulations required Long Point to analyze the effects of such excavation on possible flood conditions. Specifically, section 301.33(b)(2) provides: Aplans shall demonstrate the effects the proposed project will impose on existing flood conditions.@ *Id.* ' 301.34(b)(2) (2002); *see* Tex. Admin. Code ' 330.56(f)(4)(B)(ii). Long Point

**12**

responds that the Commission=s permitting regulations do not address the issue of soil excavation with respect to soil cover because the Commission assumes that operators will have enough soil from the excavation of the footprint itself to meet all of their soil needs. Long Point and the Commission additionally respond that there is substantial evidence in the record to support the ALJs=conclusions that soil excavation will not increase peak water-flow rates at the site. We agree with Long Point and the Commission.

The Commission=s expert, Michael D. Graeber, testified that excavation of soils for daily and intermediate cover is not a factor that the Commission specifically considers in its permitting process, partly because it assumes that the operator will have enough soil from its excavation of the footprint to use for this purpose. If for some reason there is not enough soil from the footprint area, the operator will need to bring in soil from elsewhere or excavate it from another area within the permitted boundary. As Mr. Graeber testified, because Long Point=s application information did not indicate the need to excavate outside of the footprint to supplement its cover reserve, it was not required to analyze the possible floodplain effects of such excavation. Mr. Graeber further testified that the Commission would address the issue in the future if necessary as part of Long Point=s operating procedures and requirements. Both Mr. Young and Mr. Graeber testified that soil excavation will actually reduce rather than increase peak-flow rates, by creating storage for water. This testimony amounts to substantial evidence to support the conclusion that Long Point adequately demonstrated the effects of its proposed project on flood conditions with respect to soil-cover operations. We overrule the Coalition=s sixth issue.

*Drainage*

Title 30, Section 330.56(f)(4)(A)(iv), of the administrative code requires an applicant to Ademonstrate that natural drainage patterns will not be significantly altered as a result of proposed landfill development.@ *Id.* ' 330.56(f)(4)(A)(iv). Drainage calculations for sites of Long Point=s size must be Acomputed by using USGS/DHT hydraulic equations . . . , the HEC-1 and HEC-2 computer programs . . . , or an equivalent or better method approved by the executive director.@ *Id.* ' 330.55(b)(5)(B). Long Point=s expert, Mr. Young, used the designated HEC-1 computer program in analyzing the proposed landfill=s effect on drainage. His analysis admittedly inflated both the natural and post-development peak-flow conditions at the site, a conservative estimate to have sufficient margin for error so that design of the runoff control structures would be adequate. Mr. Young testified that his design, including three detention ponds, would actually decrease peak-flow rates from the site.

The Coalition argues that (1) the ALJs abused their discretion in admitting the testimony of Mr. Young because his methodology was unsound and not generally accepted; and (2) there is not substantial evidence to support the finding that Long Point=s proposed facility will not alter natural drainage because Long Point failed to establish that its methodology was valid.

Long Point and the Commission assert that the Coalition has not preserved the alleged error of the admission of Mr. Young=s testimony. To preserve error, a motion for rehearing must set forth: (1) the particular finding of fact, conclusion of law, ruling, or other action by the agency that the complaining party asserts was error; and (2) the legal basis upon which the claim of error rests. *Central Power & Light Co. v. Public Util. Comm=n*, 36 S.W.3d 547, 569 (Tex. App.CAustin 2000, pet. denied). The purpose of a

**14**

motion for rehearing is to provide notice to the agency that the moving party is dissatisfied with its final order and will seek an appeal if the ruling is not changed; the motion must therefore be sufficiently definite to notify the agency of the error claimed in order to allow the agency the opportunity to correct it or prepare to defend it. *Suburban Util. Corp. v. Public Util. Comm=n*, 652 S.W.2d 358, 364-65 (Tex. 1983).

The Coalition did assert that the Commission=s Finding of Fact 172Cstating that Mr. Young=s analysis was conservative and based on reasonable methodologiesCis error because the methodology is neither generally acceptable nor conservative. However, the Coalition did not allege in its motion for rehearing that the testimony was erroneously admitted. The distinction is significant. A finding of fact and an evidentiary ruling are distinct components of an administrative hearing.

Although appellants are not required to assert error in motions for rehearing with the precision required in district court pleadings, on these facts we hold that the Coalition did not preserve its alleged error with respect to admission of Mr. Young=s testimony. *Compare United Sav. Ass=n of Tex. v. Vandygriff*, 594 S.W.2d 163, 170 (Tex. Civ. App.CAustin 1980, writ ref=d n.r.e.) (mere allegation in motion for rehearing that Commissioner failed to meet the requirements of two statutes held not sufficiently specific to preserve error), *and Cities for Fair Util. Rates v. Public Util. Comm=n*, 884 S.W.2d 540, 545 (Tex. App.CAustin 1994), *rev=d on other grounds*, 924 S.W.2d 933 (Tex. 1996) (complaint in motion for rehearing regarding reasonableness and recovery of upgrade costs not sufficient to preserve error with respect to Commission=s failure to consider particular factors in determining whether to include costs in appellant=s rate base), *with Morgan v. Employees=Ret. Sys.*, 872 S.W.2d 819, 822 (Tex. App.CAustin 1994, no writ) (allegations in motion for rehearing explaining the various ways in which the agency=s findings

**15**

were unsupported by the evidence is an acceptable legal objection at the agency level, despite the lack of an assertion that they were not supported by Asubstantial evidence@), *and Central Power & Light Co.*, 36 S.W.3d at 569-70 (motion for rehearing complaining of failure of agency to satisfy one subsection of a statute was adequate to preserve error with respect to the following subsection of the same statute, which necessarily incorporated and elaborated upon the previous subsection). The complaining party must set forth the particular *finding or ruling* that it claims is in error. A challenge to the reliability of an expert=s methodology has been linked to the legal sufficiency of the evidence. *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 712-14 (Tex. 1997). We therefore construe such a complaint in the motion for rehearing as preserving the substantial evidence challenge but not the challenge to the admissibility of the evidence. Because the Coalition did not assert error relating to the admissibility of Mr. Young=s testimony in its motion for rehearing, it has not preserved the issue for our review.

Moreover, if we were to consider the issue of whether the ALJs abused their discretion in admitting Mr. Young=s testimony, we would hold that there was no abuse of discretion. An agency abuses its discretion in admitting or excluding evidence if it acts without reference to guiding rules and principles. *City of Amarillo v. Railroad Comm=n*, 894 S.W.2d 491, 495 (Tex. App.CAustin 1995, writ denied). To prevail on a point of error asserting abuse of discretion, a party must further show that any error was so injurious or prejudicial that it constitutes reversible error. *Id.*

In conducting his analysis, Mr. Young used one of the few methods pre-approved by the Commission: the HEC-1 computer program. He testified that his methodology utilizing the HEC-1 was one of the three methodologies used by hydrologists in performing drainage analyses and had been previously

accepted by the Commission in similar drainage studies. He explained that the methodology he used employs a number of parameters that allow the user to adjust for the particular conditions of the watershed being studied. A publication admitted into evidence indicates that the method used by Mr. Young can be used in analyzing sites with the characteristics of Long Point=s site. The Commission=s staff member, Mr. Graeber, testified that staff does not typically review an applicant=s HEC-1 inputs, and that whether changes in peak-flow rates are significant are matters of engineering judgment.

Besides Mr. Young=s testimony about his methodology and analysis, a previous drainage study performed by an unrelated company produced peak-flow rate numbers similar to those resulting from Mr. Young=s calculations. Even without Mr. Young=s testimony on drainage, evidence of the previous study indicating similar flows to that of Mr. Young=s analysis amounts to substantial evidence to support the agency=s decision and precludes the finding of any reversible error.

The Coalition also asserts that Long Point failed in its burden to provide objective, independent validation of Mr. Young=s methodology, citing *Havner* and claiming that it requires a party proffering evidence in the form of expert testimony to bring forth objective validation of the methodology used in reaching the expert=s conclusions. *See Havner*, 953 S.W.2d 706, 712 (Tex. 1997). The *Havner* discussion to which the Coalition cites was concerned with whether an expert=s bare opinion or bald assurance of reliability and general acceptance without anything more was sufficient to render her substantive Aexpert opinions@ more than a scintilla of evidence. *See id.* The Court held that an expert=s bare opinion or bald assertion that her methodology was reliable and had general acceptance is not *alone* a sufficient indicator of scientific reliability. *See id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d

1311, 1316 (9th Cir. 1995) (on remand), *cert. denied*, 516 U.S. 869, 116 S. Ct. 189 (1995). The *Havner* court noted that reliability of expert testimony is determined by looking at numerous factors including those set out in *Robinson*. *Havner*, 953 S.W.2d at 712, 714; *see E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). If an expert=s scientific testimony is not reliable, it is not evidence, and it will therefore not be legally sufficient. *Havner*, 953 S.W.2d at 713. Similarly, the Coalition argues, unreliable testimony will not be sufficient, on its own, in a substantial evidence review.

However, the evidence in the record amounts to more than a bald assurance by Mr. Young that his methodology is valid and generally accepted. As noted above, Mr. Graeber=s testimony supports Mr. Young=s choice of HEC-1 inputs. A previous independent study produced numbers similar to Mr. Young=s. Mr. Young=s HEC-1 inputs were chosen to produce intentionally inflated pre-development and post-development flow rates so that Long Point could conservatively design a larger system of detention ponds. The ALJs were convinced by Mr. Young=s analysis and dismissed that of the Coalition=s expert, Dr. Bedient, which was well within their purview as the fact finders. We hold that the record contains substantial evidence to support the Commission=s findings and conclusion that the project will not significantly alter natural drainage. We overrule the Coalition=s fourth issue.

## CONCLUSION

The Commission=s decision was supported by substantial evidence. We affirm the district court=s judgment affirming the Commission=s order that granted to Long Point a permit to build and operate a municipal landfill facility.

**Bea Ann Smith, Justice**

**Before Chief Justice Law, Justices B. A. Smith and Puryear**

**Affirmed**

**Filed:   May 8, 2003**

19