NO. 07-03-0349-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



JANUARY 22, 2004



______________________________




MUHAMMAD SALEEM JIWANI, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 252ND DISTRICT COURT OF JEFFERSON COUNTY;



NO. 87522; HONORABLE LAYNE WALKER, JUDGE



_______________________________



Before QUINN and REAVIS and CAMPBELL, JJ.

ORDER


 Following a plea of not guilty, appellant Huhammad Saleem Jiwani was convicted
by a jury of certain transfers of claims and punishment was assessed at two years
confinement, suspended for two years. Appellant timely perfected this appeal and the
clerk's record was filed on July 23, 2003. The reporter's record was due to be filed on
August 15, 2003. By letter dated August 18, 2003, the Clerk of this Court notified Jami
Anderson, Official Court Reporter for the 252nd District Court, that the record had not been
filed. Ms. Anderson responded with a request for extension of time which was granted to
October 14, 2003. A second request due to a lengthy capital murder record and a third
request due to hand surgery in November were granted to December 1, 2003, and January
9, 2004, respectively.

 Pending before this Court is Ms. Anderson's fourth request for an extension of time
by which she seeks an additional 90 days due to a backlog in her caseload and the
November hand surgery. The fourth request is denied and Ms. Anderson has until
Monday, March 1, 2004, in which to file the complete reporter's record.

 Accordingly, we order Jami Anderson, Official Court Reporter for the 252nd District
Court of Jefferson County, to transcribe and file with the Clerk of this Court a reporter's
record as required by the Texas Rules of Appellate Procedure encompassing cause
number 87522. The record shall include all argument, evidence, and exhibits presented
to the court during trial, as well as any pretrial and post-trial hearings conducted in said
cause. We further order Ms. Anderson to file the reporter's record in a manner by which
it will actually be received by the Clerk of this Court on or before 5:00 p.m. on Monday,
March 1, 2004. No further motions for extension of time will be considered.

 Failure to file the reporter's record as directed by this Court's order will result in one
or more of the following:


 a hearing requiring Jami Anderson to show cause why she should not
be held in contempt;
 a complaint to the Court Reporter's Certification Board;
 appropriate sanctions; or
 abatement to the trial court for appropriate action.


 

 It is so ordered.

 Per Curiam

Do not publish.



Normal"> “Major stationary source” is defined by both federal and state law to mean any\
building, structure, facility, or installation which emits, or has the potential to emit, 100 tons\
per year or more of any regulated new source review pollutant. 40 C.F.R. § 52.21(b)(1),\
(6); 30 Tex. Admin. Code § 116.160(c)(1) (Tex. Comm’n on Envtl. Quality). There is no\
dispute in the present case that Sandy Creek’s proposed power plant will be a major\
stationary source. \
'

var WPFootnote7 = ' This is the federal definition that was incorporated by reference into the state\
definition. The state rule, 30 Tex. Admin. Code § 116.160(a), has subsequently been\
amended to omit the federal BACT definition. However, this amendment has not been\
approved by the EPA and each party relies on the federal definition in the present appeal.
\
'

var WPFootnote8 = ' In support of our construction of the BACT definition being limited to those control\
technologies that may be applied to the proposed facility, we agree with the Seventh\
Circuit’s analysis of the substantially similar federal definition of BACT.
\
The Act is explicit that "clean fuels" is one of the control methods that the\
EPA has to consider. Well, nuclear fuel is clean, and so the implication, one\
might think, is that the agency could order Prairie State [applicant] to\
redesign its plant as a nuclear plant rather than a coal-fired one, or could\
order it to explore the possibility of damming the Mississippi to generate\
hydroelectric power, or to replace coal-fired boilers with wind turbines. That\
approach would invite a litigation strategy that would make seeking a permit\
for a new power plant a Sisyphean labor, for there would always be one\
more option to consider. The petitioners to their credit shy away from\
embracing the extreme implications of such a strategy, which would stretch\
the term "control technology" beyond the breaking point and collide with the\
"alternatives" provision of the statute. But they do not suggest another\
stopping point.
\
Sierra Club v. U.S. E.P.A., 499 F.3d 653, 655 (7th Cir. 2007).
\
'

var WPFootnote9 = ' EDI, in its brief, tacitly concedes this construction of the definition when it states,
\
The definition directs one to determine the lowest level of emissions that is\
achievable for a proposed major stationary source through the application of\
production processes or methods, including fuel cleaning and innovative fuel\
combustion techniques. That is the crux of it. One has to identify the source\
and, then, one undertakes an analysis to see what is the lowest achievable\
emissions level that might be had from the source, if one relied on various\
different production processes and methods. \
(emphasis added). Clearly, the first step in the process of performing a BACT analysis is\
identifying the proposed source and then applying control technologies to that proposed\
source. If the proposed source were ignored, then, under EDI’s contention, every energy\
producing facility would be required to consider IGCC, even if the proposed source were\
a wind plant or a nuclear plant.
\
'

function WPShow( WPid, WPtext )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'visible'" );
 else
 {
 if( floatwnd == 0 || floatwnd.closed )
 floatwnd = window.open( "", "comment", "toolbars=0,width=600,height=200,resizable=1,scrollbars=1,dependent=1" );
 floatwnd.document.open( "text/html", "replace" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( "\r\n" );
 floatwnd.document.write( "
\r\n" );
 floatwnd.document.write( WPtext );
 floatwnd.document.write( '
Close');
 floatwnd.document.write( "
" );
 floatwnd.document.close();
 floatwnd.focus();
 }
}

function WPHide( WPid )
{
 if( bInlineFloats )
 eval( "document.all." + WPid + ".style.visibility = 'hidden'" );
}







NO. 07-07-0306-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

APRIL 14, 2009

______________________________


BLUE SKIES ALLIANCE, TEXANS PROTECTING OUR WATER,
ENVIRONMENT AND NATURAL RESOURCES (TPOWER),
AND ENVIRONMENTAL DEFENSE, INC., APPELLANTS

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, APPELLEE
_________________________________

FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY;

NO. D-1-GN-06-002911; HON. STEPHEN YELENOSKY, PRESIDING
                                      _______________________________

Before CAMPBELL, HANCOCK and PIRTLE, JJ.
OPINION
          In response to the motion for rehearing of appellants, we overrule the motion for
rehearing, withdraw our opinion of January 29, 2009, and issue the following opinion in its
place.
          Appellants, Texans Protecting Our Water, Environment, and Natural Resources
(TPOWER) and Environmental Defense, Inc. (EDI), appeal a final judgment affirming a
final order of appellee, the Texas Commission on Environmental Quality (commission),
which approved an application filed by appellee, Sandy Creek Energy Associates, L.P.,
(Sandy Creek) for an air quality permit necessary for Sandy Creek to build a pulverized
coal power plant in McLennan County, Texas. We affirm.
Background
          Sandy Creek applied to the commission for a state air quality flexible permit that
would authorize Sandy Creek’s construction and operation of an 800 megawatt pulverized
coal power plant in rural McLennan County, Texas. The Federal Clean Air Act (FCAA)
requires that, before building a proposed facility that will meet certain definitions as a major
source of emissions, the project owner must secure an air permit meeting federal
standards. Because the proposed plant was to be located in an area where the national
ambient air quality standards (NAAQS) are being met, Sandy Creek was required to submit
certain analyses of the proposed plant for prevention of significant deterioration (PSD)
review.
          After the commission’s Executive Director’s staff performed administrative and
technical review of the Sandy Creek application, the commission directly referred the
application to the State Office of Administrative Hearings (SOAH) for a hearing on whether
the proposed plant complied with all applicable statutory and regulatory requirements. 
Both TPOWER and EDI were designated parties in the SOAH hearing. Administrative law
judges with SOAH held the hearing over two days before submitting a certified question
to the commission regarding the scope of a best available control technology (BACT)
analysis. The commission, after receiving briefing from the parties, responded to the
certified question. The administrative law judges then issued a proposal for decision
recommending that the commission find that Sandy Creek fully demonstrated that its
proposed plant would fully comply with applicable law. 
          After hearing oral argument from the parties, the commission voted to accept the
recommendations in the proposal for decision and issue the air quality permit to Sandy
Creek. In addition, the commission issued extensive findings of fact and conclusions of
law relating to its decision to issue the permit.
          TPOWER and EDI timely filed suit seeking judicial review of the commission’s
actions. After holding a hearing on the merits, the trial court affirmed the commission order
issuing the permit. TPOWER and EDI appealed the trial court’s judgment to this court.
          Both TPOWER and EDI present one issue on appeal. TPOWER contends that the
commission erred in issuing an air quality permit to Sandy Creek after finding that
emissions from Sandy Creek’s proposed plant will increase ozone in a downwind
nonattainment area because a de minimis level for ozone does not exist. EDI contends
that the commission erred in excluding evidence that the BACT analysis for a coal-fueled
power plant should have included consideration of integrated gasification combined cycle
(IGCC) or other coal-conversion processes.


 
TPOWER’s Issue
          TPOWER contends that the commission erred in issuing a PSD permit to Sandy
Creek because the commission found that the proposed pulverized coal power plant will
increase ozone in Dallas and Fort Worth (DFW) nonattainment areas. TPOWER contends
that there is no de minimis level for ozone and, therefore, any contribution to ozone levels
in nonattainment areas should be prohibited or should trigger an obligation to obtain ozone
offsets by Sandy Creek. TPOWER’s contention relates to the commission’s determination
that extremely low levels of ozone precursors flowing into a nonattainment area do not
legally “cause or contribute” to a violation of the NAAQS. TPOWER additionally contends
that there was insufficient evidence to support the commission’s issuance of the air quality
permit to Sandy Creek.
          The FCAA requires the Environmental Protection Agency (EPA) to list emissions
that “cause or contribute to air pollution which may reasonably be anticipated to endanger
public health or welfare” and to set primary and secondary NAAQS for such pollutants. 
See 42 U.S.C.A. §§ 7408(a), 7409(a) (West 2003). Based on the NAAQS, the EPA
determines whether counties comply with the NAAQS in relation to each pollutant for which
NAAQS have been set and designates the counties as either nonattainment (exceeding
the NAAQS) or attainment (meeting NAAQS or insufficient information to determine the
county’s status). See 42 U.S.C. § 7407(d)(1)(A). Depending on a particular county’s
designation, different reviews are required as part of applications for air permits. 
          The FCAA authorizes states to assume primary regulatory status under certain
specific circumstances. For a state to assume this regulatory authority, it must submit to
the EPA a State Implementation Plan (SIP) that provides for implementation, maintenance,
and enforcement of the NAAQS. 42 U.S.C. § 7410(a)(1). The State’s SIP must be
reviewed and approved by the EPA as meeting the requirements of the FCAA and EPA
rules and regulations. 40 C.F.R. § 52.02(a) (2003). Texas’s SIP has been approved by
the EPA. See 40 C.F.R. § 52.2270; 57 Fed.Reg. 28,093 (June 24, 1992). While Texas
has primary regulatory authority, the EPA maintains oversight authority and must approve
any changes to the SIP.
          In Texas, the commission has been charged with the review of air permit
applications and the issuance of air permits. See Tex. Health & Safety Code Ann. §
382.051 (Vernon Supp. 2008). In applying for an air quality permit, an applicant must
make certain showings regarding the quantity of pollutant emissions that the proposed
facility will produce. See 30 Tex. Admin. Code § 116.111 (2008) (Tex. Comm’n on Envtl.
Quality). If the proposed facility is to be located in an attainment area, the applicant must
comply with all requirements of a PSD review. See id. § 116.111(2)(I). The commission’s
PSD review requires compliance with certain specified EPA PSD review regulations. See
Id. § 116.160(a), (c). In making a PSD showing, an applicant must use the air quality
modeling procedures specified in the EPA Guideline on Air Quality Models, unless another
modeling procedure has been approved by the EPA. Id. § 116.160(d). In addition, an
applicant must show that the proposed facility will not “cause, or contribute to, air pollution
in excess of any . . . (B) national ambient air quality standard in any air quality control
region.” 42 U.S.C. § 7475(a)(3)(B). 
          One “criteria pollutant” for which the EPA has set NAAQS is ozone. See 40 C.F.R.
§§ 50.9, .10. However, estimating quantities of ozone that a proposed facility will emit is
complicated by the fact that ozone is not a direct emission. Ozone is created when volatile
organic compounds (VOC) and oxides of nitrogen (NOX) mix in the atmosphere and are
acted upon by sunlight. Because of the complexity in estimating the creation of ozone, the
EPA created a rule


 that rebuttably presumes that no single source of the ozone precursor
VOC will cause or contribute to ozone exceedances. See 40 C.F.R. Part 51, Appendix S,
Sec. III.C.


 While TPOWER is correct in its indication that the presumption provided by the
EPA specifically relates to VOC emissions, we see no reason why the underlying
measurement complications that led to the presumption would not apply equally to NOX
emissions.
          Like the EPA, the commission has made certain assumptions applicable to the
emission of ozone precursors. Most notably, the commission’s Air Quality Modeling
Guidelines provide that, “If the methane-normalized VOC to NOX ratio is 2:1 or less, no
significant increase of ozone would be expected.” In the present case, the commission
found that, “If a source is NOX-dominated, then local ozone impacts will be insignificant and
the analysis is deemed complete.” It, further, found that, “Sandy Creek properly applied
the screening technique to determine that the Station would be NOX-dominated.” Thus,
under the commission’s assumption, if a source is determined to be NOX-dominated, no
significant ozone impact is expected and no further analysis is required. Since the
commission found Sandy Creek’s proposed plant to be NOX-dominated, the commission
was entitled to assume that the plant would have no significant ozone impact.
          From these assumptions, we can see that both the EPA and the commission
interpret the “cause or contribute to” standard as allowing some contribution to an NAAQS
violation, provided that the contribution is determined to be insignificant or to have virtually
no effect on the nonattainment area. While we review an administrative agency’s legal
conclusions for errors of law, see H.G. Sledge, Inc. v. The Prospective Inv. and Trading
Co., 36 S.W.3d 597, 602 (Tex.App.–Austin 2000, pet. denied), we are to defer to the
agency’s interpretation of its own rules unless that interpretation is plainly erroneous or
inconsistent, see Phillips Petro. Co. v. Tex. Comm’n on Envtl. Quality, 121 S.W.3d 502,
507 (Tex.App.–Austin 2003, no pet.). Both EPA and the commission interpret the “cause
or contribute to” standard to allow extremely low levels of ozone precursors to flow into an
ozone nonattainment area without that contribution legally violating the “cause or contribute
to” standard. We believe that this interpretation is reasonable, consistent, and strikes an
appropriate balance between protecting air quality and encouraging economic growth. 
Thus, because both the federal and state interpretation of the “cause or contribute to”
standard will tolerate some insignificant level of contribution to a downwind NAAQS ozone
exceedance, we overrule TPOWER’s issue to the extent that it contends that an
application must be denied or that an offset must be obtained when any downwind
contribution is made to an NAAQS ozone exceedance. 
          TPOWER also contends that the commission’s discussion of the “measurability” of
the ozone contribution from Sandy Creek’s proposed plant creates a rule or policy that NOX
emissions that are not “measurable by monitor” are de minimis and, therefore, will not be
found to “cause or contribute to” a downwind NAAQS ozone violation. We are aware of
the presumption that favors adopting rules of general applicability through formal rule-making procedures, Rodriguez v. Service Lloyds Ins. Co., 997 S.W.2d 248, 255 (Tex.
1999), however, nothing in the record of this case indicates that the commission intended
to or did create a rule of general applicability. In accordance with EPA guidance, the
commission reviewed Sandy Creek’s application and the impact of the proposed facility on
downwind nonattainment areas on a case-by-case basis. 44 Fed.Reg. 3277 (January 16,
1979). Consequently, the commission’s decision of whether Sandy Creek’s proposed
facility will have a significant impact on the DFW nonattainment areas applies only to the
present case and does not create a rule or policy of general applicability that any downwind
impact on a nonattainment area that is less than what is measurable by monitor will be
deemed insignificant. 
          Because the agencies’ presumptions are rebuttable, we must address TPOWER’s
subsidiary issue of whether there was substantial evidence to support the commission’s
issuance of the air quality permit to Sandy Creek.
          Judicial review of an administrative order following a contested case proceeding is
governed by the substantial evidence rule. See Tex. Gov’t Code Ann. § 2001.174 (Vernon
2008); Coal. for Long Point Pres. v. Tex. Comm’n on Envtl. Quality, 106 S.W.3d 363, 366
(Tex.App.–Austin 2003, pet. denied). In performing a substantial evidence review, the
reviewing court must determine whether the evidence, as a whole, is such that reasonable
minds could have reached the same conclusion as the agency in the disputed action. 
Coal. for Long Point Pres., 106 S.W.3d at 366. We may not substitute our judgment as
to the weight to be afforded the evidence for that of the agency. City of El Paso v. Pub.
Util. Comm’n of Tex., 883 S.W.2d 179, 185 (Tex. 1994). The issue is not whether the
agency reached the correct conclusion, but whether some reasonable basis exists in the
record for the action taken by the agency. Id.; Coal. for Long Point Pres., 106 S.W.3d at
367. In fact, the evidence in the record may actually preponderate against the decision of
the agency and nonetheless amount to substantial evidence. City of El Paso, 883 S.W.2d
at 185. The findings, inferences, conclusions, and decisions of an administrative agency
are presumed to be supported by substantial evidence and the burden is on the contestant
to prove otherwise. Id.; Coal. for Long Point Pres., 106 S.W.3d at 367.
          TPOWER’s main appellate issue in this case relates to whether the commission
could conclude that any contribution of emissions in violation of a downwind NAAQS could
be deemed so insignificant as to legally constitute no contribution. We have addressed
this issue above. However, TPOWER also contends that Sandy Creek’s facility’s
contribution of less than 0.03 parts per billion (ppb) to the ozone level


 in DFW
nonattainment areas is not an insignificant amount and that it will have more than virtually
no effect on these nonattainment areas. 
          As noted above, we must presume that the findings of the commission are
supported by substantial evidence and the burden rests with TPOWER to prove otherwise. 
See City of El Paso, 883 S.W.2d at 185; Coal. for Long Point Pres., 106 S.W.3d at 367. 
In the present case, the commission found that Sandy Creek’s proposed facility’s
“incremental effect on DFW ozone levels would be approximately 0.04 percent of the 8-hour ozone NAAQS, which is two orders of magnitude below the fraction of the applicable
NAAQS that is defined as insignificant for other criteria pollutants” and “Sandy Creek[‘s
proposed facility] will not measurably influence ambient ozone concentrations in the DFW
ozone nonattainment area.” Thus, we start from the presumption that substantial evidence
supported the commission’s finding that Sandy Creek’s proposed facility will not
significantly affect the DFW ozone nonattainment areas.
          To meet its burden to prove that the commission’s “no significant impact” finding is
not supported by substantial evidence, TPOWER contends that Sandy Creek’s less than
0.03 ppb ozone impact on the DFW nonattainment areas constitutes 0.5 percent of DFW’s
ozone problems. However, TPOWER calculates this percentage of contribution by
considering Sandy Creek’s contribution only in relation to the NAAQS exceedance. As a
result, this calculation denies Sandy Creek any proportional benefit of ozone contribution
below the NAAQS. In other words, Sandy Creek’s proposed facility would contribute 0.5
percent of the ozone that already exceeds the NAAQS, while the commission’s 0.04
percent finding identifies the percentage of Sandy Creek’s contribution in relation to the
allowable ozone under the NAAQS. From an equitable perspective, the commission’s
finding is a more accurate assessment of Sandy Creek’s ozone impact. 
          Further, there is no record evidence identified by TPOWER of what, if any, impact
Sandy Creek’s less than 0.03 ppb ozone contribution would have on the DFW ozone
nonattainment areas. Essentially, TPOWER contends that the sole impact of the
commission’s issuance of an air quality permit to Sandy Creek will be the addition of 0.03
ppb of ozone to the violation, which will make it that much harder for the DFW
nonattainment areas to attain compliance with the NAAQS. However, TPOWER has not
identified any record evidence of the tangible consequences of this impact. For example,
TPOWER repeatedly indicates that the ozone contribution that Sandy Creek’s proposed
facility will cause in the DFW nonattainment areas will require local officials and businesses
to bear the cost of offsetting the Sandy Creek ozone contribution, but TPOWER fails to
identify any evidence of the cost of procuring a less than 0.03 ppb ozone reduction. 
Likewise, TPOWER has failed to identify any evidence of the extent to which a less than
0.03 ppb ozone increase in an ozone nonattainment area would adversely impact the
health of residents of the nonattainment area. Given the absence of evidence of the
tangible effects of Sandy Creek’s contribution to DFW ozone levels, we have no basis from
which to question the commission’s determination that Sandy Creek’s less than 0.03 ppb
ozone contribution is legally insignificant.
          Further, we find far more than substantial evidence in the record to support the
commission’s finding that Sandy Creek’s proposed plant would not significantly contribute
to DFW NAAQS ozone nonattainment. 
          Consequently, we overrule TPOWER’s issue.
EDI’s Issue 
          EDI contends that the commission erred in excluding, as not relevant, evidence that
the “best available control technology” analysis (BACT) for a pulverized coal power plant
should have included an analysis of emissions limitations achievable through the coal-conversion process of integrated gasification/combined cycle (IGCC).


 While the issue
presented by EDI relates to the exclusion of evidence, its argument contends that the
evidence was relevant because the applicable statutes require a BACT analysis to include
an analysis of IGCC. 
          Part C of the FCAA, see 42 U.S.C. §§ 7470-7492, sets forth requirements for the
prevention of significant deterioration of air quality in those areas of the country considered
to be in attainment of the NAAQS. When a state wants to assume primary responsibility
over its air quality, it must present a SIP to the EPA which, inter alia, must meet the
applicable requirements for the prevention of significant deterioration of air quality found
in part C of the FCAA. 42 U.S.C. § 7410(a)(2)(J). As previously noted, the EPA has
approved Texas’s SIP and has granted Texas authority to issue and enforce PSD permits. 
See 40 C.F.R. § 52.2270(c); 57 Fed.Reg. 28093 (June 24, 1992).
          As part of the PSD review, applicants for flexible air quality permits are required to
demonstrate that their proposed facilities will use the best available control technology to
reduce emissions. Tex. Health & Safety Code Ann. § 382.0518(b)(1); 30 Tex. Admin.
Code §§ 116.111(a)(2)(C), 116.711(3) (2008) (Tex. Comm’n on Envtl. Quality). Best
available control technology is defined as 
an emissions limitation (including a visible emission standard) based on the
maximum degree of reduction for each pollutant subject to regulation under
[the] Act which would be emitted from any proposed major stationary source



or major modification which the Administrator, on a case-by-case basis,
taking into account energy, environmental, and economic impacts and other
costs, determines is achievable for such source or modification through
application of production processes or available methods, systems, and
techniques, including fuel cleaning or treatment or innovative fuel combustion
techniques for control of such pollutant . . . . 
 
40 C.F.R. § 52.12(b)(12).


 For the commission to issue a permit, it must find, from the
information available to the commission, that “the proposed facility for which a permit . . .
is sought will use the best available control technology, considering the technical
practicability and economic reasonableness of reducing or eliminating the emissions
resulting from the facility . . . .” Tex. Health & Safety Code Ann. § 382.0518(b)(1). 
          The issue presented by EDI relates to the statutory construction of the BACT
definition quoted above. EDI contends that the definition requires a BACT analysis to
analyze IGCC as an “application of production process or available methods, systems, and
techniques, including . . . innovative fuel combustion techniques for control . . .” of
pollutants. The commission and Sandy Creek contend that the definition requires that the
BACT analysis analyze each control technology that can be applied to the “proposed
major stationary source.” According to the appellees, the IGCC process would require a
complete redesign of the Sandy Creek facility and, as such, it is not a control technology
that could be applied to the proposed facility.
          Statutory construction presents a question of law, which is reviewed by a de novo
standard of review. City of Garland v. Dallas Morning News, 22 S.W.3d 351, 357 (Tex.
2000). Our primary objective in construing a statute is to give effect to the legislature’s
intent. Mitchell Energy Corp. v. Ashworth, 943 S.W.2d 436, 438 (Tex. 1997). The starting
point in determining the legislature’s intent is the plain language used in the statute. Bragg
v. Edwards Aquifer Auth., 71 S.W.3d 729, 734 (Tex. 2002). We ascribe to this language
its plain and common meaning and presume that the language used expresses the
legislature’s intent. Nat’l Liab. and Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000). 
If a statute is clear and unambiguous, we generally interpret the statute according to its
common meaning without resort to rules of construction or extraneous evidence. State v.
Shumake, 199 S.W.3d 279, 284 (Tex. 2006). However, we may consider other matters
in ascertaining legislative intent, including the objective of the law, its history, and the
consequences of a particular construction. Id.
          In looking at the definition of BACT, we find no ambiguity in the words used. The
core components of the BACT definition provide that BACT is “an emissions limitation” for
“any proposed major stationary source” which is “achievable . . . through application of
production processes or available methods, systems, and techniques . . . .” Put another
way, BACT requires that those production processes, methods, systems, and techniques
(control technologies) that will achieve the maximum reduction of regulated pollutants be
applied to any proposed major stationary source. We believe that the BACT definition
clearly provides that only those control technologies that can be applied to the proposed
major source be considered in the BACT analysis. Thus, the only control technologies that
must be considered in a BACT analysis are those control technologies that can be
incorporated into or added to the facility as proposed by the applicant. Thus, ascribing the
common meaning to the words used in the BACT definition, we conclude that a BACT
analysis must consider any control technology that may be applied to the proposed facility,
but does not need to consider any control technology that would require such a redesign
of the facility that it would constitute an alternative proposal.


 We further conclude that the
examples of control technologies that are expressly identified by the definition, “fuel
cleaning or treatment or innovative fuel combustion techniques,” are subject to the
limitation that any control technologies must be capable of application to the proposed
facility.



          However, our determination that the BACT definition does not require a BACT
analysis to consider control technologies that would require a redesign of the proposed
facility does not resolve the issue presented by EDI. Having determined that the definition
distinguishes between control technologies that are capable of being applied to the
proposed facility and those that would require the source to be redesigned, we must turn
to the factual issue of whether IGCC can be applied to the pulverized coal power plant
proposed by Sandy Creek or would require a redesign of the facility.
          In the present case, the commission reviewed Sandy Creek’s application, including
its BACT analysis, and recommended granting Sandy Creek a permit. The application was
referred to the SOAH for a contested case hearing. As part of this hearing, the SOAH
administrative law judges hearing this case submitted a certified question to the
commission. The certified question asked,
In an air permit application that includes a prevention of significant
deterioration (PSD) review, must an applicant that proposes to construct a
pulverized coal boiler power plant include other electric generation
technologies, such as IGCC (integrated gasification/combined cycle)
technology, in its best available control technology (BACT) analysis?In response, the Executive Director of the commission explained that IGCC would require
a redesign of the proposed facility and, thus, would be outside of the scope of a BACT
analysis. After receiving this response to its certified question, the SOAH administrative
law judges issued a proposal for decision concluding that Sandy Creek had complied with
all requirements. Soon after the administrative law judges issued their proposal for
decision, the commission ordered that the permit issue. EDI sought judicial review of the
commission’s issuance of the permit to Sandy Creek, but the trial court affirmed the
commission’s decision.
          Our review of an administrative order following a contested case proceeding is
governed by the substantial evidence rule. See Tex. Gov’t Code Ann. § 2001.174 (Vernon
2008); Coal. for Long Point Pres., 106 S.W.3d at 366. The findings, inferences,
conclusions, and decisions of an administrative agency are presumed to be supported by
substantial evidence and the burden to prove otherwise is on the contestant. Id. This is
so because the legislature intends that an agency created to centralize expertise in a
certain regulatory area be given a large degree of latitude in the methods it uses to
accomplish its regulatory function. Phillips Petroleum Co. v. Tex. Comm’n on Envtl.
Quality, 121 S.W.3d 502, 507-08 (Tex.App.–Austin 2003, no pet.). 
          The crucial question in the present case is whether the commission appropriately
drew the line between what constitutes a control technology that could be applied to Sandy
Creek’s proposed plant and what constitutes a redesign of the proposed plant. In its
response to SOAH’s certified question, the Executive Director explained that IGCC would
necessitate a redesign of the source that Sandy Creek had proposed. Of significance, EDI
does not argue that IGCC would not necessitate a redesign of the proposed facility. 
Rather, EDI contends that the BACT definition, discussed above, requires an analysis of
IGCC. It is clear that an IGCC process, by which electricity is produced by the burning of
gasses extracted from coal to drive turbines that turn electric power generators, is
significantly different from the pulverized coal power plant, which produces electricity by
burning coal to generate steam that drives a conventional steam-powered turbine, as
proposed by Sandy Creek. As EDI has offered no evidence that IGCC is a process that
could be applied to the pulverized coal power plant proposed by Sandy Creek, EDI has
failed to meet its burden. 
          Consequently, we conclude that the IGCC evidence offered by EDI was not relevant. 
See Tex. R. Evid. 401. Accordingly, we overrule EDI’s issue.
Conclusion
          Having overruled the issues of the appellants, we affirm the judgment of the trial
court.
 
                                                                           Mackey K. Hancock

                                                                                     Justice