# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-03-00229-CV

**Phillips Petroleum Company, Appellant**

**v.**

**Texas Commission on Environmental Quality and Sweeny
Cogeneration Limited Partnership, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. GN200286, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING**

## O P I N I O N

Appellant Phillips Petroleum Company ("Phillips") contends by one issue that the district court erred in affirming a decision by appellee Texas Commission on Environmental Quality[1] to grant nitrogen oxide ($NO_x$) emissions allowances for eight boilers to appellee Sweeny Cogeneration Limited Partnership ("SCLP"). Phillips claimed entitlement to the allowances as the owner of the boilers, whereas SCLP claimed entitlement because it controlled the boilers in a

---

[1] In the underlying action, the name of the regulatory agency was the Texas Natural Resource Conservation Commission ("TNRCC"). By statute effective September 1, 2001, the legislature changed the name of the TNRCC to the Texas Commission on Environmental Quality, to be effective January 1, 2004. The statute granted the TNRCC authority to adopt a timetable for phasing in the change of the agency's name, so that until January 1, 2004, the agency may perform any act authorized by law under either title. *See* Act of April 20, 2001, 77th Leg., R.S., ch. 965, § 18.01, 2001 Tex. Gen. Laws 1985. On September 1, 2002, the agency began using its new name, while continuing to recognize the former. In this opinion, we will refer to the agency as the Commission.

cogeneration facility that it operated within Phillips's refinery. Phillips argues that the Commission acted arbitrarily and unreasonably by considering SCLP's "operational control" instead of Phillips's ownership in allocating the allowances. For the reasons set forth below, we affirm the judgment of the district court affirming the decision of the Commission.

## BACKGROUND

In late 1995, Phillips and SCLP entered into an agreement for SCLP to construct and operate a cogeneration[2] facility at Phillips's refinery in Brazoria County. To be able to build three new cogeneration units, SCLP had to obtain an air quality permit from the Commission for new $NO_x$ emissions. Because the facility would be located in the Houston-Galveston Clean Air Act ozone nonattainment area, designated by the EPA for reduction in $NO_x$ emissions, the permitting process had additional requirements.

The Commission considered the new facility to be a major source of $NO_x$ emissions because it would emit more than twenty-five tons per year. Permitting of major sources required the Commission to conduct a Nonattainment Area New Source Review (NNSR), which involved more strict and costly emissions control requirements than those for facilities exempt from the NNSR. A new facility could avoid the NNSR requirements, however, through a process of "site-wide emissions netting," that is, averaging increased emissions from a new source of emissions with decreased emissions from an existing source.

---

[2] "Cogeneration involves the simultaneous production of electrical power and thermal energy, such as heat or steam, usually at an industrial site." *Public Util. Comm'n v. Gulf States Utils. Co.*, 809 S.W.2d 201, 203 (Tex. 1991) (citing *Federal Energy Regulatory Comm'n v. Mississippi*, 456 U.S. 742, 750 & n.11 (1982)).

2

To avoid the NNSR requirements, SCLP included in its air quality permit application a plan to net emissions from the eight existing boilers with emissions from the new cogeneration units. The Commission determined that SCLP's application was deficient, in part because SCLP did not submit sufficient proof that it would "maintain ultimate operational control" over the boilers. Upon a representation by Phillips that it "agrees that it has no authority independent of the Partnership's authority under the permit, to cause emissions from the boilers," the Commission issued the air quality permit to SCLP.

In December 2000, the Commission issued new rules creating the Mass Emissions Cap and Trade (MECT) program to reduce $NO_x$ emissions in the Houston-Galveston area. *See* 30 Tex. Admin. Code §§ 101.350-.363 (2003). Under this program, the Commission planned to allocate emissions "allowances" to existing facilities, based on their emissions for the years 1997 through 1999. *Id.* §§ 101.351, .360(a)(1). In June 2001, Phillips and SCLP filed competing applications claiming entitlement to the emissions allowances for the boilers. The Commission allocated the allowances to SCLP. Phillips contested the Commission's determination and requested redistribution of the allowances to itself as the owner of the boilers. The executive director of the Commission responded that the original allocation was proper, with the "most persuasive factor" being that "both SCLP and Phillips argued, and TNRCC agreed, that SCLP had operational control of the boilers . . . in the netting exercise for the SCLP cogeneration facility in 1996. . . . Once that operational control passed to SCLP, the boilers were no longer part of the Phillips site."

Phillips requested review of the Commission's decision in a Travis County district court, on the ground that the decision was arbitrary and unreasonable. *See* Tex. Health & Safety

3

Code Ann. § 382.032(a), (e) (West 2001); Tex. Water Code Ann. § 5.351 (West 2000).  The district court affirmed the Commission's decision, and it is from that judgment that Phillips appeals.

## STANDARD OF REVIEW

It is undisputed that the Commission's decision falls under the Texas Clean Air Act. *See generally* Tex. Health & Safety Code Ann. §§ 382.001-.216 (West 2001 & Supp. 2004) (Texas Clean Air Act).  In the appeal of a Commission decision governed by the act, other than cancellation or suspension of a variance, we determine whether the decision is invalid, arbitrary, or unreasonable. *See id.* § 382.032(e).  Whether the Commission failed to follow its own rules presents a question of law.  *See BFI Waste Sys. of N. Am., Inc. v. Martinez Envtl. Group*, 93 S.W.3d 570, 575 (Tex. App.—Austin 2002, pet. denied).  Therefore, we apply a *de novo* standard of review.  *See United Copper Indus., Inc. v. Grissom*, 17 S.W.3d 797, 801 (Tex. App.—Austin 2000, pet. dism'd).

## ANALYSIS

Phillips contends in its sole issue that the Commission acted arbitrarily and unreasonably by considering factors outside of the purview of the MECT rules, specifically that the Commission allocated the emissions allowances based on irrelevant policy considerations and SCLP's "operational control," instead of Phillips's ownership, of the boilers.  To put our examination of the Commission's decision in the proper context, we must first discuss in further detail SCLP's 1996 air quality permit application process, which figured prominently in the Commission's decision to allocate the emissions allowances to SCLP.

4

As part of SCLP's air permit application to build and operate the cogeneration facility, SCLP wanted to avoid the costly NNSR procedures for a new "source" of emissions. Thus, SCLP sought to employ "site-wide emissions netting" by offsetting increased emissions from the new cogeneration units with decreased emissions from the existing boilers, with six "backup boilers" and two "designated boilers" only intermittently fired. In this manner, the eight boilers and three cogeneration units would be combined as an existing source for netting purposes. A source is "any building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Federal Clean Air Act." 30 Tex. Admin. Code § 116.12(18) (2003). Because a "building, structure, facility, or installation" under the NNSR rules had to be "under the control of the same person (or persons under common control)," *id.* § 116.12(4) (2003), the Commission sought confirmation that SCLP would control the emissions. SCLP then included in its application a copy of its agreement with Phillips, which contained several clauses giving SCLP authority over the boilers, including the following:

> 5(c)     Phillips shall provide the Partnership rights to, and control over emissions from the Backup Boilers, including the Partnership's right to direct operation of the Backup Boilers to assure compliance with any air permit or other requirement relating to emissions from the Project.

> * * * *

> 7.8(b)   The Partnership shall have the right to control the operation of all the Backup Boilers and direct the firing of the Designated Boilers.

> * * * *

> 7.15(b)  Phillips shall maintain, and . . . operate the Backup Boilers. If the Partnership has obtained an air permit . . ., such operation shall be on behalf

of the Partnership and subject to the Partnership's direction of the designated Boilers and control of the backup Boilers.

The Commission responded to SCLP that it considered the application to be deficient because the agreement did not sufficiently represent that "SCLP will maintain ultimate operational control over the referenced boilers." The Commission went on to state that "[t]his control criterion must clearly be documented in the permit application if the boilers are to be included in site-wide emissions netting." Phillips responded that if the Commission added special conditions in the permit, including a clause that the permit regulates the eight boilers only by limiting their emissions, "during the term of the permit, and as long as emissions from the standby boilers are limited by the permit, Phillips agrees that it has no authority independent of the Partnership's authority under the permit, to cause emissions from the boilers." The Commission, after determining in an internal memo that it was "satisfied that the partnership has sufficient control over the facilities included in [the] permit application," issued the air quality permit for the cogeneration facility to SCLP in September 1996.

In December 2000, the Commission created the MECT program to reduce $NO_x$ emissions in the Houston-Galveston area. *See* 30 Tex. Admin. Code §§ 101.350-.363. As part of the program, owners or operators of facilities in operation before January 1, 1997, and with a threshold level of emissions, were required to report their level of emissions averaged over 1997 through 1999. *Id.* §§ 101.351, .360(a)(1). The Commission would then allocate emissions allowances and deposit them into compliance accounts for the facilities. *Id.* § 101.353. The

6

allowances were to shrink over time to reduce emissions. The emissions allowances have economic value because they can be traded or sold. *Id.* § 101.356.

In June 2001, SCLP and Phillips both filed applications for emissions allowances, SCLP for the cogeneration facility and Phillips for the refinery. SCLP asserted its entitlement to the allocations for the boilers because (i) Phillips represented in 1996 that SCLP had control of the boilers; (ii) the boilers were included in SCLP's air quality permit; and (iii) the boilers were transferred to SCLP's emissions inventory account in 1999. Phillips, in a letter accompanying its application, stated that it was also claiming the allowances for the boilers and that the matter was in dispute.

After the Commission allocated the emissions allowances for the boilers to SCLP, Phillips requested reconsideration of the decision. Phillips asserted that "[a]s owner, Phillips is clearly a proper person to receive the allowances." Phillips further contended that SCLP could not be the operator of the six boilers that were shut down and, as to the other two boilers, Phillips had the "better claim" because it ceded operational control to SCLP only for the purposes of site-wide emissions netting, not for allocation of emissions allowances. SCLP responded that Phillips's ownership of the boilers was irrelevant because the Commission had to deposit the emissions allowances into the account for a "site." *Id.* § 101.350(1).

The definition of "site," under the MECT program, is the "total of all stationary sources located on one or more contiguous or adjacent properties, which are under common control of the same person." *Id.* §§ 101.350(13); 122.10 (2003). In its letter responding to Phillips's request for reconsideration, the Commission determined that it was proper to allocate the emissions

7

allowances to SCLP because "[a]s determined during the netting exercise in 1996, the boilers and the cogeneration facility are under the common control of SCLP and therefore represent a 'site' under both the netting rules and the emissions cap and trade rules."

We now turn to an examination of the Commission's decision. This requires us to examine the applicable rules and determine whether the Commission acted outside of its authority. We construe the text of an administrative rule under the same principles as if it were a statute. *Texas Gen. Indem. Co. v. Texas Workers' Comp. Comm'n*, 36 S.W.3d 635, 641 (Tex. App.—Austin 2000, no pet.). We bear in mind that an administrative agency has the power to interpret its own rules, and its interpretation is entitled to great weight and deference. *Id.* The agency's construction of its rule is controlling unless it is plainly erroneous or inconsistent. *Id.*

"When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 17 (1965). This is particularly true when the rule involves complex subject matter. *See Equitable Trust Co. v. Finance Comm'n*, 99 S.W.3d 384, 387 (Tex. App.—Austin 2003, no pet.). We recognize that the legislature intends an agency created to centralize expertise in a certain regulatory area "be given a large degree of latitude in the methods it uses to accomplish its regulatory function." *Reliant Energy, Inc. v. Public Util. Comm'n*, 62 S.W.3d 833, 838 (Tex. App.—Austin 2001, no pet.) (citing *State v. Public Util. Comm'n*, 883 S.W.2d 190, 197 (Tex. 1994)).

Here, because the MECT rules do not give guidance to the Commission when it has to decide between competing applications for emissions allowances, if there is room for a policy determination in the rule, we will defer to the agency's interpretation unless it is plainly erroneous

8

or inconsistent with the language of the rule. *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 604 (Tex. App.—Austin 2000, pet. denied). Our task is to determine whether an agency's decision is based on a permissible interpretation of its statutory scheme. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Because the interpretation represents the view of the regulatory body that drafted and administers the rule, the agency interpretation, if reasonable, becomes a part of the rule itself. *See McMillan v. Texas Natural Res. Conservation Comm'n*, 983 S.W.2d 359, 362 (Tex. App.—Austin 1998, pet. denied).

Phillips contends that the Commission's decision was in error because the Commission considered "operational control" and policy concerns, neither of which are to be found in the text of the rules governing the MECT program. Even if "operational control" is relevant, Phillips argues, the Commission gave undue weight to that factor and failed to consider the most relevant factor: Phillips's ownership of the boilers. Phillips further asserts that because the MECT program is an entirely different regulatory program than the air quality permit program, the Commission should not have considered SCLP's operational control of the boilers for permitting purposes. But the Commission confirmed at oral argument that the Texas Clean Air Act governs both programs. We agree with the Commission that, as a policy matter, viewing two regulatory schemes that fall under the umbrella of the same act in isolation from each other would be unworkable.

In essence, Phillips asks that only its ownership and ability to "flip the switches" of the boilers be taken into account, and in turn we should ignore the fact that SCLP, Phillips, and the Commission agreed in 1996 that the boilers fell under SCLP's control for the purposes of the air

9

quality permit. To be able to include the boilers in SCLP's source for netting purposes, the Commission needed assurance that SCLP controlled not only the new cogeneration units but also the existing boilers. A "source" under the NNSR rules is "[a]ny building, structure, facility, or installation which emits or may emit any air pollutant subject to regulation under the Federal Clean Air Act." 30 Tex. Admin. Code § 116.12(18). A "building, structure, facility, or installation" is "all of the pollutant-emitting activities which belong to the same industrial grouping, are located in one or more contiguous or adjacent properties, and *are under the control of the same person (or persons under common control).*" *Id.* § 116.12(4) (emphasis added). Once the Commission received the assurance that SCLP controlled the boilers, the Commission issued the air permit to SCLP. From then on, it was SCLP, not Phillips, that had the primary responsibility of operating the boilers in compliance with Commission regulations. Phillips agreed at oral argument, in fact, that if there were a change in operational status of the boilers under the air quality permit, SCLP, not Phillips, would apply to the Commission for the change.

Under the air quality permitting rules, the boilers were a part of SCLP's source. Under the MECT rules, to obtain the allowances, the "owner or operator of a facility," which is a subset of a source under the NNSR rules, had to certify the level of activity for the boilers during the years 1997 to 1999. *Id.* § 101.360(a). The Commission would then deposit the allowances into a compliance account, "where allowances held by a facility or multiple facilities at a single *site* are recorded." *Id.* § 101.350(7) (emphasis added). A "site" under the MECT rules has a very similar definition to a "source" under the air quality permit rules: "the total of all stationary sources located

10

on one or more contiguous or adjacent properties, which are under the control of the same person (or persons under common control)." *Compare id.* § 122.10(27), *with* § 116.12(4), (18).

The Commission agreed at oral argument that the term "operational control" does not appear in the MECT regulations, but the Commission's decision did not hinge solely on SCLP's "operational control." The relevant inquiry was: if the boilers were part of SCLP's source under the air quality regulations, were the boilers also a part of SCLP's site, as defined almost identically to source, under the MECT regulations? Because the answer to that inquiry is yes, and because the Commission is entitled to look to one entity for permitting purposes, it follows that the Commission allocated the emissions allowances to SCLP. And, in any event, we view the Commission's employment of the term "operational control" as a reasonable interpretation of its rules, given that the definitions of both source under the NNSR rules and site under the MECT rules contain the phrase "under the control of the same person." Thus, the Commission's decision was reasonable.

Phillips argues that we should not defer to the Commission's decision because it involves no special expertise simply to decide between the terms "owner" and "operator." We disagree with Phillips's characterization of the factors that the Commission considered. The Commission's determination instead involved construction of complex air quality and MECT regulations, and we defer to the Commission's interpretation of the interplay of these technical rules. *See Reliant Energy*, 62 S.W.3d at 838. We overrule Phillips's issue and affirm the judgment of the district court affirming the Commission's decision.

11

## CONCLUSION

When deciding between competing applications from Phillips and SCLP for $NO_x$ emissions allowances for eight boilers, the Commission had to determine whose "site" contained the boilers under the MECT regulations. In turn, the Commission necessarily examined the history of whose "source" contained the boilers for air quality permitting purposes. Because the record reflects that the boilers were part of SCLP's source under the NNSR regulations and its similarly defined site under the MECT regulations, we hold that the Commission's decision to allocate the $NO_x$ emissions allowances to SCLP was reasonable. Accordingly, we affirm the judgment of the district court affirming the Commission's decision.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed: November 20, 2003

12