NO. 07-07-0306-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

APRIL 14, 2009

_____

BLUE SKIES ALLIANCE, TEXANS PROTECTING OUR WATER,
ENVIRONMENT AND NATURAL RESOURCES (TPOWER),
AND ENVIRONMENTAL DEFENSE, INC., APPELLANTS

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY, APPELLEE
_____

FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY;

NO. D-1-GN-06-002911; HON. STEPHEN YELENOSKY, PRESIDING
_____

Before CAMPBELL, HANCOCK and PIRTLE, JJ.

**OPINION**

In response to the motion for rehearing of appellants, we overrule the motion for rehearing, withdraw our opinion of January 29, 2009, and issue the following opinion in its place.

Appellants, Texans Protecting Our Water, Environment, and Natural Resources (TPOWER) and Environmental Defense, Inc. (EDI), appeal a final judgment affirming a

final order of appellee, the Texas Commission on Environmental Quality (commission), which approved an application filed by appellee, Sandy Creek Energy Associates, L.P., (Sandy Creek) for an air quality permit necessary for Sandy Creek to build a pulverized coal power plant in McLennan County, Texas. We affirm.

## Background

Sandy Creek applied to the commission for a state air quality flexible permit that would authorize Sandy Creek's construction and operation of an 800 megawatt pulverized coal power plant in rural McLennan County, Texas. The Federal Clean Air Act (FCAA) requires that, before building a proposed facility that will meet certain definitions as a major source of emissions, the project owner must secure an air permit meeting federal standards. Because the proposed plant was to be located in an area where the national ambient air quality standards (NAAQS) are being met, Sandy Creek was required to submit certain analyses of the proposed plant for prevention of significant deterioration (PSD) review.

After the commission's Executive Director's staff performed administrative and technical review of the Sandy Creek application, the commission directly referred the application to the State Office of Administrative Hearings (SOAH) for a hearing on whether the proposed plant complied with all applicable statutory and regulatory requirements. Both TPOWER and EDI were designated parties in the SOAH hearing. Administrative law judges with SOAH held the hearing over two days before submitting a certified question to the commission regarding the scope of a best available control technology (BACT)

2

analysis. The commission, after receiving briefing from the parties, responded to the certified question. The administrative law judges then issued a proposal for decision recommending that the commission find that Sandy Creek fully demonstrated that its proposed plant would fully comply with applicable law.

After hearing oral argument from the parties, the commission voted to accept the recommendations in the proposal for decision and issue the air quality permit to Sandy Creek. In addition, the commission issued extensive findings of fact and conclusions of law relating to its decision to issue the permit.

TPOWER and EDI timely filed suit seeking judicial review of the commission's actions. After holding a hearing on the merits, the trial court affirmed the commission order issuing the permit. TPOWER and EDI appealed the trial court's judgment to this court.

Both TPOWER and EDI present one issue on appeal. TPOWER contends that the commission erred in issuing an air quality permit to Sandy Creek after finding that emissions from Sandy Creek's proposed plant will increase ozone in a downwind nonattainment area because a *de minimis* level for ozone does not exist. EDI contends that the commission erred in excluding evidence that the BACT analysis for a coal-fueled power plant should have included consideration of integrated gasification combined cycle (IGCC) or other coal-conversion processes.[1]

---

[1] While EDI's issue references BACT consideration of "other coal-conversion processes," its appellate brief does not identify any other processes that Sandy Creek should have considered in its BACT analysis. Further, whether IGCC constitutes a "coal-conversion process" is not raised in the present appeal and we express no opinion on the matter.

3

**TPOWER's Issue**

TPOWER contends that the commission erred in issuing a PSD permit to Sandy Creek because the commission found that the proposed pulverized coal power plant will increase ozone in Dallas and Fort Worth (DFW) nonattainment areas. TPOWER contends that there is no *de minimis* level for ozone and, therefore, any contribution to ozone levels in nonattainment areas should be prohibited or should trigger an obligation to obtain ozone offsets by Sandy Creek. TPOWER's contention relates to the commission's determination that extremely low levels of ozone precursors flowing into a nonattainment area do not legally "cause or contribute" to a violation of the NAAQS. TPOWER additionally contends that there was insufficient evidence to support the commission's issuance of the air quality permit to Sandy Creek.

The FCAA requires the Environmental Protection Agency (EPA) to list emissions that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare" and to set primary and secondary NAAQS for such pollutants. See 42 U.S.C.A. §§ 7408(a), 7409(a) (West 2003). Based on the NAAQS, the EPA determines whether counties comply with the NAAQS in relation to each pollutant for which NAAQS have been set and designates the counties as either nonattainment (exceeding the NAAQS) or attainment (meeting NAAQS or insufficient information to determine the county's status). See 42 U.S.C. § 7407(d)(1)(A). Depending on a particular county's designation, different reviews are required as part of applications for air permits.

The FCAA authorizes states to assume primary regulatory status under certain specific circumstances. For a state to assume this regulatory authority, it must submit to the EPA a State Implementation Plan (SIP) that provides for implementation, maintenance, and enforcement of the NAAQS. 42 U.S.C. § 7410(a)(1). The State's SIP must be reviewed and approved by the EPA as meeting the requirements of the FCAA and EPA rules and regulations. 40 C.F.R. § 52.02(a) (2003). Texas's SIP has been approved by the EPA. See 40 C.F.R. § 52.2270; 57 Fed.Reg. 28,093 (June 24, 1992). While Texas has primary regulatory authority, the EPA maintains oversight authority and must approve any changes to the SIP.

In Texas, the commission has been charged with the review of air permit applications and the issuance of air permits. See TEX. HEALTH & SAFETY CODE ANN. § 382.051 (Vernon Supp. 2008). In applying for an air quality permit, an applicant must make certain showings regarding the quantity of pollutant emissions that the proposed facility will produce. See 30 TEX. ADMIN. CODE § 116.111 (2008) (Tex. Comm'n on Envtl. Quality). If the proposed facility is to be located in an attainment area, the applicant must comply with all requirements of a PSD review. See id. § 116.111(2)(I). The commission's PSD review requires compliance with certain specified EPA PSD review regulations. See Id. § 116.160(a), (c). In making a PSD showing, an applicant must use the air quality modeling procedures specified in the EPA Guideline on Air Quality Models, unless another modeling procedure has been approved by the EPA. Id. § 116.160(d). In addition, an applicant must show that the proposed facility will not "cause, or contribute to, air pollution

5

in excess of any . . . (B) national ambient air quality standard in any air quality control region." 42 U.S.C. § 7475(a)(3)(B).

One "criteria pollutant" for which the EPA has set NAAQS is ozone. See 40 C.F.R. §§ 50.9, .10. However, estimating quantities of ozone that a proposed facility will emit is complicated by the fact that ozone is not a direct emission. Ozone is created when volatile organic compounds (VOC) and oxides of nitrogen ($NO_X$) mix in the atmosphere and are acted upon by sunlight. Because of the complexity in estimating the creation of ozone, the EPA created a rule[2] that rebuttably presumes that no single source of the ozone precursor VOC will cause or contribute to ozone exceedances. See 40 C.F.R. Part 51, Appendix S, Sec. III.C.[3] While TPOWER is correct in its indication that the presumption provided by the EPA specifically relates to VOC emissions, we see no reason why the underlying measurement complications that led to the presumption would not apply equally to $NO_X$ emissions.

Like the EPA, the commission has made certain assumptions applicable to the emission of ozone precursors. Most notably, the commission's Air Quality Modeling

---

[2] This rule was subject to public notice and comment before it was adopted. See 45 Fed.Reg. 52,676, 52,679-80 (August 7, 1980).

[3] We note that Sec. III.A. of Appendix S specifically limits the application of section III to states where EPA has not approved a state preconstruction review program. The EPA has approved Texas's program, so section III of Appendix S does not directly apply in this case. However, the EPA's Interpretative Ruling, from which the current version of Appendix S evolved, indicates that the EPA intends to approve different state regulations so long as the overall impact on emissions of the regulation is "at least as stringent as the EPA Interpretative Ruling." 44 Fed.Reg. 3280 (January 16, 1979). Thus, we construe Appendix S to set the minimum standard applicable to state review of air quality permits.

Guidelines provide that, "If the methane-normalized VOC to $NO_X$ ratio is 2:1 or less, no significant increase of ozone would be expected." In the present case, the commission found that, "If a source is $NO_X$-dominated, then local ozone impacts will be insignificant and the analysis is deemed complete." It, further, found that, "Sandy Creek properly applied the screening technique to determine that the Station would be $NO_X$-dominated." Thus, under the commission's assumption, if a source is determined to be $NO_X$-dominated, no significant ozone impact is expected and no further analysis is required. Since the commission found Sandy Creek's proposed plant to be $NO_X$-dominated, the commission was entitled to assume that the plant would have no significant ozone impact.

From these assumptions, we can see that both the EPA and the commission interpret the "cause or contribute to" standard as allowing some contribution to an NAAQS violation, provided that the contribution is determined to be insignificant or to have virtually no effect on the nonattainment area. While we review an administrative agency's legal conclusions for errors of law, see H.G. Sledge, Inc. v. The Prospective Inv. and Trading Co., 36 S.W.3d 597, 602 (Tex.App.–Austin 2000, pet. denied), we are to defer to the agency's interpretation of its own rules unless that interpretation is plainly erroneous or inconsistent, see Phillips Petro. Co. v. Tex. Comm'n on Envtl. Quality, 121 S.W.3d 502, 507 (Tex.App.–Austin 2003, no pet.). Both EPA and the commission interpret the "cause or contribute to" standard to allow extremely low levels of ozone precursors to flow into an ozone nonattainment area without that contribution legally violating the "cause or contribute to" standard. We believe that this interpretation is reasonable, consistent, and strikes an appropriate balance between protecting air quality and encouraging economic growth.

7

Thus, because both the federal and state interpretation of the "cause or contribute to" standard will tolerate some insignificant level of contribution to a downwind NAAQS ozone exceedance, we overrule TPOWER's issue to the extent that it contends that an application must be denied or that an offset must be obtained when **any** downwind contribution is made to an NAAQS ozone exceedance.

TPOWER also contends that the commission's discussion of the "measurability" of the ozone contribution from Sandy Creek's proposed plant creates a rule or policy that $NO_X$ emissions that are not "measurable by monitor" are *de minimis* and, therefore, will not be found to "cause or contribute to" a downwind NAAQS ozone violation. We are aware of the presumption that favors adopting rules of general applicability through formal rule-making procedures, Rodriguez v. Service Lloyds Ins. Co., 997 S.W.2d 248, 255 (Tex. 1999), however, nothing in the record of this case indicates that the commission intended to or did create a rule of general applicability. In accordance with EPA guidance, the commission reviewed Sandy Creek's application and the impact of the proposed facility on downwind nonattainment areas on a case-by-case basis. 44 Fed.Reg. 3277 (January 16, 1979). Consequently, the commission's decision of whether Sandy Creek's proposed facility will have a significant impact on the DFW nonattainment areas applies only to the present case and does not create a rule or policy of general applicability that any downwind impact on a nonattainment area that is less than what is measurable by monitor will be deemed insignificant.

Because the agencies' presumptions are rebuttable, we must address TPOWER's subsidiary issue of whether there was substantial evidence to support the commission's issuance of the air quality permit to Sandy Creek.

Judicial review of an administrative order following a contested case proceeding is governed by the substantial evidence rule. See TEX. GOV'T CODE ANN. § 2001.174 (Vernon 2008); Coal. for Long Point Pres. v. Tex. Comm'n on Envtl. Quality, 106 S.W.3d 363, 366 (Tex.App.–Austin 2003, pet. denied). In performing a substantial evidence review, the reviewing court must determine whether the evidence, as a whole, is such that reasonable minds could have reached the same conclusion as the agency in the disputed action. Coal. for Long Point Pres., 106 S.W.3d at 366. We may not substitute our judgment as to the weight to be afforded the evidence for that of the agency. City of El Paso v. Pub. Util. Comm'n of Tex., 883 S.W.2d 179, 185 (Tex. 1994). The issue is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency. Id.; Coal. for Long Point Pres., 106 S.W.3d at 367. In fact, the evidence in the record may actually preponderate against the decision of the agency and nonetheless amount to substantial evidence. City of El Paso, 883 S.W.2d at 185. The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence and the burden is on the contestant to prove otherwise. Id.; Coal. for Long Point Pres., 106 S.W.3d at 367.

TPOWER's main appellate issue in this case relates to whether the commission could conclude that **any** contribution of emissions in violation of a downwind NAAQS could be deemed so insignificant as to legally constitute no contribution. We have addressed

9

this issue above. However, TPOWER also contends that Sandy Creek's facility's contribution of less than 0.03 parts per billion (ppb) to the ozone level[4] in DFW nonattainment areas is not an insignificant amount and that it will have more than virtually no effect on these nonattainment areas.

As noted above, we must presume that the findings of the commission are supported by substantial evidence and the burden rests with TPOWER to prove otherwise. See City of El Paso, 883 S.W.2d at 185; Coal. for Long Point Pres., 106 S.W.3d at 367. In the present case, the commission found that Sandy Creek's proposed facility's "incremental effect on DFW ozone levels would be approximately 0.04 percent of the 8-hour ozone NAAQS, which is two orders of magnitude below the fraction of the applicable NAAQS that is defined as insignificant for other criteria pollutants" and "Sandy Creek['s proposed facility] will not measurably influence ambient ozone concentrations in the DFW ozone nonattainment area." Thus, we start from the presumption that substantial evidence supported the commission's finding that Sandy Creek's proposed facility will not significantly affect the DFW ozone nonattainment areas.

---

[4] TPOWER does not specifically challenge the commission's finding that Sandy Creek's proposed facility would contribute "less than 0.03 ppb" to DFW ozone levels. TPOWER did present evidence that the contribution would be 0.6 ppb, but it has not challenged the sufficiency of the evidence upon which the commission's finding was based.

Further, the commission specifically found that Sandy Creek's proposed facility would contribute less than 0.03 ppb to the DFW ozone levels. This finding is supported by the testimony of David Cabe, who reached this conclusion based on use of previously performed modeling of Central Texas contributions of ozone to the DFW nonattainment areas. The finding indicates that the commission accepted the evidence offered by Sandy Creek and rejected the contrary evidence offered by TPOWER. We may not substitute our judgment as to the weight to be afforded the evidence for that of the agency. City of El Paso, 883 S.W.2d at 185.

10

To meet its burden to prove that the commission's "no significant impact" finding is not supported by substantial evidence, TPOWER contends that Sandy Creek's less than 0.03 ppb ozone impact on the DFW nonattainment areas constitutes 0.5 percent of DFW's ozone problems. However, TPOWER calculates this percentage of contribution by considering Sandy Creek's contribution only in relation to the NAAQS exceedance. As a result, this calculation denies Sandy Creek any proportional benefit of ozone contribution below the NAAQS. In other words, Sandy Creek's proposed facility would contribute 0.5 percent of the ozone that already exceeds the NAAQS, while the commission's 0.04 percent finding identifies the percentage of Sandy Creek's contribution in relation to the allowable ozone under the NAAQS. From an equitable perspective, the commission's finding is a more accurate assessment of Sandy Creek's ozone impact.

Further, there is no record evidence identified by TPOWER of what, if any, impact Sandy Creek's less than 0.03 ppb ozone contribution would have on the DFW ozone nonattainment areas. Essentially, TPOWER contends that the sole impact of the commission's issuance of an air quality permit to Sandy Creek will be the addition of 0.03 ppb of ozone to the violation, which will make it that much harder for the DFW nonattainment areas to attain compliance with the NAAQS. However, TPOWER has not identified any record evidence of the tangible consequences of this impact. For example, TPOWER repeatedly indicates that the ozone contribution that Sandy Creek's proposed facility will cause in the DFW nonattainment areas will require local officials and businesses to bear the cost of offsetting the Sandy Creek ozone contribution, but TPOWER fails to identify any evidence of the cost of procuring a less than 0.03 ppb ozone reduction.

11

Likewise, TPOWER has failed to identify any evidence of the extent to which a less than 0.03 ppb ozone increase in an ozone nonattainment area would adversely impact the health of residents of the nonattainment area. Given the absence of evidence of the tangible effects of Sandy Creek's contribution to DFW ozone levels, we have no basis from which to question the commission's determination that Sandy Creek's less than 0.03 ppb ozone contribution is legally insignificant.

Further, we find far more than substantial evidence in the record to support the commission's finding that Sandy Creek's proposed plant would not significantly contribute to DFW NAAQS ozone nonattainment.

Consequently, we overrule TPOWER's issue.

**EDI's Issue**

EDI contends that the commission erred in excluding, as not relevant, evidence that the "best available control technology" analysis (BACT) for a pulverized coal power plant should have included an analysis of emissions limitations achievable through the coal-conversion process of integrated gasification/combined cycle (IGCC).[5] While the issue presented by EDI relates to the exclusion of evidence, its argument contends that the evidence was relevant because the applicable statutes require a BACT analysis to include an analysis of IGCC.

---

[5] EDI's issue specifically challenges the commission's ruling. However, it appears that the ruling excluding EDI's pre-filed evidence as not relevant was a ruling of the administrative law judges of the SOAH.

12

Part C of the FCAA, see 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas of the country considered to be in attainment of the NAAQS. When a state wants to assume primary responsibility over its air quality, it must present a SIP to the EPA which, *inter alia*, must meet the applicable requirements for the prevention of significant deterioration of air quality found in part C of the FCAA. 42 U.S.C. § 7410(a)(2)(J). As previously noted, the EPA has approved Texas's SIP and has granted Texas authority to issue and enforce PSD permits. See 40 C.F.R. § 52.2270(c); 57 Fed.Reg. 28093 (June 24, 1992).

As part of the PSD review, applicants for flexible air quality permits are required to demonstrate that their proposed facilities will use the best available control technology to reduce emissions. TEX. HEALTH & SAFETY CODE ANN. § 382.0518(b)(1); 30 TEX. ADMIN. CODE §§ 116.111(a)(2)(C), 116.711(3) (2008) (Tex. Comm'n on Envtl. Quality). Best available control technology is defined as

> an emissions limitation (including a visible emission standard) based on the maximum degree of reduction for each pollutant subject to regulation under [the] Act which would be emitted from any proposed major stationary source[6] or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant . . . .

---

[6] "Major stationary source" is defined by both federal and state law to mean any building, structure, facility, or installation which emits, or has the potential to emit, 100 tons per year or more of any regulated new source review pollutant. 40 C.F.R. § 52.21(b)(1), (6); 30 TEX. ADMIN. CODE § 116.160(c)(1) (Tex. Comm'n on Envtl. Quality). There is no dispute in the present case that Sandy Creek's proposed power plant will be a major stationary source.

13

40 C.F.R. § 52.12(b)(12).[7] For the commission to issue a permit, it must find, from the information available to the commission, that "the proposed facility for which a permit . . . is sought will use the best available control technology, considering the technical practicability and economic reasonableness of reducing or eliminating the emissions resulting from the facility . . . ." TEX. HEALTH & SAFETY CODE ANN. § 382.0518(b)(1).

The issue presented by EDI relates to the statutory construction of the BACT definition quoted above. EDI contends that the definition requires a BACT analysis to analyze IGCC as an "application of production process or available methods, systems, and techniques, including . . . innovative fuel combustion techniques for control . . ." of pollutants. The commission and Sandy Creek contend that the definition requires that the BACT analysis analyze each control technology that can be **applied** to the "proposed major stationary source." According to the appellees, the IGCC process would require a complete redesign of the Sandy Creek facility and, as such, it is not a control technology that could be applied to the proposed facility.

Statutory construction presents a question of law, which is reviewed by a *de novo* standard of review. City of Garland v. Dallas Morning News, 22 S.W.3d 351, 357 (Tex. 2000). Our primary objective in construing a statute is to give effect to the legislature's intent. Mitchell Energy Corp. v. Ashworth, 943 S.W.2d 436, 438 (Tex. 1997). The starting point in determining the legislature's intent is the plain language used in the statute. Bragg

---

[7] This is the federal definition that was incorporated by reference into the state definition. The state rule, 30 TEX. ADMIN. CODE § 116.160(a), has subsequently been amended to omit the federal BACT definition. However, this amendment has not been approved by the EPA and each party relies on the federal definition in the present appeal.

v. Edwards Aquifer Auth., 71 S.W.3d 729, 734 (Tex. 2002). We ascribe to this language its plain and common meaning and presume that the language used expresses the legislature's intent. Nat'l Liab. and Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000). If a statute is clear and unambiguous, we generally interpret the statute according to its common meaning without resort to rules of construction or extraneous evidence. State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). However, we may consider other matters in ascertaining legislative intent, including the objective of the law, its history, and the consequences of a particular construction. Id.

In looking at the definition of BACT, we find no ambiguity in the words used. The core components of the BACT definition provide that BACT is "an emissions limitation" for "any proposed major stationary source" which is "achievable . . . through application of production processes or available methods, systems, and techniques . . . ." Put another way, BACT requires that those production processes, methods, systems, and techniques (control technologies) that will achieve the maximum reduction of regulated pollutants be applied to any proposed major stationary source. We believe that the BACT definition clearly provides that only those control technologies that can be **applied** to the **proposed** major source be considered in the BACT analysis. Thus, the only control technologies that must be considered in a BACT analysis are those control technologies that can be incorporated into or added to the facility as proposed by the applicant. Thus, ascribing the common meaning to the words used in the BACT definition, we conclude that a BACT analysis must consider any control technology that may be applied to the proposed facility, but does not need to consider any control technology that would require such a redesign

15

of the facility that it would constitute an alternative proposal.[8] We further conclude that the examples of control technologies that are expressly identified by the definition, "fuel cleaning or treatment or innovative fuel combustion techniques," are subject to the limitation that any control technologies must be capable of application to the proposed facility.[9]

---

[8] In support of our construction of the BACT definition being limited to those control technologies that may be applied to the proposed facility, we agree with the Seventh Circuit's analysis of the substantially similar federal definition of BACT.

> The Act is explicit that "clean fuels" is one of the control methods that the EPA has to consider. Well, nuclear fuel is clean, and so the implication, one might think, is that the agency could order Prairie State [applicant] to redesign its plant as a nuclear plant rather than a coal-fired one, or could order it to explore the possibility of damming the Mississippi to generate hydroelectric power, or to replace coal-fired boilers with wind turbines. That approach would invite a litigation strategy that would make seeking a permit for a new power plant a Sisyphean labor, for there would always be one more option to consider. The petitioners to their credit shy away from embracing the extreme implications of such a strategy, which would stretch the term "control technology" beyond the breaking point and collide with the "alternatives" provision of the statute. But they do not suggest another stopping point.

Sierra Club v. U.S. E.P.A., 499 F.3d 653, 655 (7th Cir. 2007).

[9] EDI, in its brief, tacitly concedes this construction of the definition when it states,

> The definition directs one to determine the lowest level of emissions that is achievable for a proposed major stationary source through the application of production processes or methods, including fuel cleaning and innovative fuel combustion techniques. That is the crux of it. One has to identify the source and, then, one undertakes an analysis to see what is the lowest achievable emissions level that might be had from the source, if one relied on various different production processes and methods.

(emphasis added). Clearly, the first step in the process of performing a BACT analysis is identifying the proposed source and then applying control technologies to that proposed source. If the proposed source were ignored, then, under EDI's contention, every energy producing facility would be required to consider IGCC, even if the proposed source were a wind plant or a nuclear plant.

However, our determination that the BACT definition does not require a BACT analysis to consider control technologies that would require a redesign of the proposed facility does not resolve the issue presented by EDI. Having determined that the definition distinguishes between control technologies that are capable of being applied to the proposed facility and those that would require the source to be redesigned, we must turn to the factual issue of whether IGCC can be applied to the pulverized coal power plant proposed by Sandy Creek or would require a redesign of the facility.

In the present case, the commission reviewed Sandy Creek's application, including its BACT analysis, and recommended granting Sandy Creek a permit. The application was referred to the SOAH for a contested case hearing. As part of this hearing, the SOAH administrative law judges hearing this case submitted a certified question to the commission. The certified question asked,

> In an air permit application that includes a prevention of significant deterioration (PSD) review, must an applicant that proposes to construct a pulverized coal boiler power plant include other electric generation technologies, such as IGCC (integrated gasification/combined cycle) technology, in its best available control technology (BACT) analysis?

In response, the Executive Director of the commission explained that IGCC would require a redesign of the proposed facility and, thus, would be outside of the scope of a BACT analysis. After receiving this response to its certified question, the SOAH administrative law judges issued a proposal for decision concluding that Sandy Creek had complied with all requirements. Soon after the administrative law judges issued their proposal for decision, the commission ordered that the permit issue. EDI sought judicial review of the

17

commission's issuance of the permit to Sandy Creek, but the trial court affirmed the commission's decision.

Our review of an administrative order following a contested case proceeding is governed by the substantial evidence rule. See TEX. GOV'T CODE ANN. § 2001.174 (Vernon 2008); Coal. for Long Point Pres., 106 S.W.3d at 366. The findings, inferences, conclusions, and decisions of an administrative agency are presumed to be supported by substantial evidence and the burden to prove otherwise is on the contestant. Id. This is so because the legislature intends that an agency created to centralize expertise in a certain regulatory area be given a large degree of latitude in the methods it uses to accomplish its regulatory function. Phillips Petroleum Co. v. Tex. Comm'n on Envtl. Quality, 121 S.W.3d 502, 507-08 (Tex.App.–Austin 2003, no pet.).

The crucial question in the present case is whether the commission appropriately drew the line between what constitutes a control technology that could be applied to Sandy Creek's proposed plant and what constitutes a redesign of the proposed plant. In its response to SOAH's certified question, the Executive Director explained that IGCC would necessitate a redesign of the source that Sandy Creek had proposed. Of significance, EDI does not argue that IGCC would not necessitate a redesign of the proposed facility. Rather, EDI contends that the BACT definition, discussed above, requires an analysis of IGCC. It is clear that an IGCC process, by which electricity is produced by the burning of gasses extracted from coal to drive turbines that turn electric power generators, is significantly different from the pulverized coal power plant, which produces electricity by burning coal to generate steam that drives a conventional steam-powered turbine, as

18

proposed by Sandy Creek.  As EDI has offered no evidence that IGCC is a process that could be applied to the pulverized coal power plant proposed by Sandy Creek, EDI has failed to meet its burden.

Consequently, we conclude that the IGCC evidence offered by EDI was not relevant. See TEX. R. EVID. 401.  Accordingly, we overrule EDI's issue.

**Conclusion**

Having overruled the issues of the appellants, we affirm the judgment of the trial court.

Mackey K. Hancock
Justice